# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JAMES PREIMESBERGER,**<br><br>　　　　**Plaintiff**<br><br>　　v.<br><br>**UNITED STATES,**<br><br>　　　　**Defendant** | **CASE NO. 1:19-CV-1441 AWI SAB**<br><br>**ORDER ON DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br>(Doc. No. 22) |

This is a tax refund case filed by Plaintiff James Preimesberger ("Preimesberger") against the United States. Specifically, Preimesberger seeks to recover $6,601.41 that he alleges was improperly assessed against him through the Internal Revenue Service's ("IRS") invocation of 26 U.S.C. § 6672 ("§ 6672"). The United States has responded to the Complaint through the IRS, and the IRS now moves for judgment on the pleadings under Rule 12(c). For the reasons that follow, the motion will be denied.

## RULE 12(c) FRAMEWORK

Under Federal Rule of Civil Procedure 12(c), "[a]fter the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." Fed. R. Civ. Pro. 12(c). Because the motions are functionally identical, the same standard of review applicable to a Rule 12(b)(6) motion applies to a Rule 12(c) motion. Gregg v. Department of Public Safety, 870 F.3d 883, 887 (9th Cir. 2017). The non-moving party's allegations are accepted as true and all reasonable inferences are drawn in the non-moving party's favor. See Herrera v. Zumiez, Inc., 953 F.3d 1063, 1068 (9th Cir. 2020); Hines v. Youseff, 914 F.3d 1218, 1227 (9th Cir. 2019). Any allegations made by the moving party that have been denied or

contradicted are assumed to be false. See MacDonald v. Grace Church Seattle, 457 F.3d 1079, 1081 (9th Cir. 2006); Hal Roach Studios v. Richard Feiner & Co., Inc., 896 F.2d 1542, 1550 (9th Cir. 1989). However, the Court is "not required to accept as true allegations that contradict exhibits attached to the Complaint, or matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." Seven Arts Filmed Entm't, Ltd. v. Content Media Corp. PLC, 733 F.3d 1251, 1254 (9th Cir. 2013). To avoid judgment, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S 662, 678 (2009); Harris v. County of Orange, 682 F.3d 1126, 1131 (9th Cir. 2012). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678; see Harris, 682 F.3d at 1131. "Plausibility" means "more than a sheer possibility," but less than a probability, and facts that are "merely consistent" with liability fall short of "plausibility." Iqbal, 556 U.S. at 678. Although Rule 12(c) does not mention leave to amend, courts may grant a Rule 12(c) motion with leave to amend. See Gregg, 870 F.3d at 887, 889; Pacific W. Grp. v. Real Time Solutions, 321 F. App'x. 566, 569 (9th Cir. 2008). The court need not grant leave to amend when doing so would be futile and the deficiencies in the complaint could not be cured by amendment. See Deveraturda v. Globe Aviation Sec. Servs., 454 F.3d 1043, 1046 (9th Cir. 2006); see also Gregg, 870 F.3d at 887.

**BACKGROUND**

As relevant to the tax periods at issue, Meridian Health Services Holdings, Inc. ("Meridian") owned and operated five skilled nursing home facilities in California ("the Facilities"). Preimesberger owned less than 10% of Meridian's stock and was employed by each of the Facilities to operate their skilled nursing activities.

The overwhelming majority of each Facility's revenues were derived from patients covered by Medicare and/or Medi-Cal, which meant that each Facility's cashflow was dependent on timely reimbursement payments from Medicare and Medi-Cal. Beginning in 2010 and

worsening over time through 2015, the Facilities experienced serious cashflow problems primarily as a result of delays and disruptions in Medicare and Medi-Cal reimbursement payments. From 2010 through 2015, the Facilities accrued substantial Medicare and Medi-Cal receivables due from the United States. Eventually the cashflow problem became so acute that the Facilities could not meet all of their operational expenses.

At first, Preimesberger caused Meridian to bridge each Facility's cashflow gap by drawing on a line of credit from Capital Finance, Inc. ("CFI"). Every time Meridian drew on the line of credit, Meridian was required to provide CFI with the nature and amount of each Facility's obligations for which funds were requested. Meridian requested that the funds be used to pay all of the wages of the Facility's employees, i.e. net wages and withholding taxes, but CFI only authorized and provided funds for the payment of net wages. As a result, the Facilities were unable to pay all or a portion of their withholding tax obligations.

Unlike a typical business, the Facilities could not simply cease operations when they could no longer pay their employees' net wages and the necessary withholding taxes. Under state and federal regulations, nursing homes/skilled nursing facilities must follow what Preimesberger describes as a lengthy and detailed procedure for closure that includes notification to the residents of the Facilities and appropriate governmental agencies and transferring residents to other appropriate care facilities. In the interim, a nursing home/skilled nursing facility is required to remain open and maintain the existing standard of care for all residents. Failure to follow these regulations are punishable through civil and criminal penalties.

Preimesberger alleges that as a result of the applicable regulations, each Facility was required to first apply funds that were necessary to maintain the appropriate standard of care for each Facility's residents. Of necessity, this meant that property rent, utility bills, and payment of wages to employees all had to be paid. Because of the backlog of Medicare and Medi-Cal payments, as well as the restrictions placed on funds provided by CFI, the Facilities could only pay their employees net wages and not the withholding taxes. Preimesberger alleges that it was not possible for the Facilities to meet both their withholding obligations and their regulatory obligations to remain open and maintain the standard of care.

Aware of this untenable situation, Preimesberger negotiated the sale of the Facilities to Providence Health Group ("Providence") in the Summer of 2014. Providence agreed to close the sale no later than November 1, 2014 and agreed to satisfy each of the Facility's outstanding withholding tax liability through Medicare and Medi-Cal receivables. Preimesberger believed that the sale would maintain the standard of care and provide sufficient funds to satisfy any outstanding withholding taxes. However, the sale did not close until March 1, 2015, and, contrary to the contract, Providence did not satisfy the outstanding withholding tax liabilities.

Pursuant to § 6672, the IRS has assessed Preimesberger with penalties regarding each of the Facility's unpaid withholding tax liabilities for the tax periods ending June 30, 2014, September 30, 2014, December 31, 2014, March 31, 2015, and June 30, 2015. On information and belief, the total amount assessed is not less than $2.4 million.

On August 5, 2020, the Court granted in part and denied in part the IRS's motion for Rule 12(b)(6) motion to dismiss. See Doc. No. 17. In relevant part, the Court dismissed theories of equitable estoppel and set-off. See Doc. No. 17. The Court declined to dismiss Preimesberger's theory that he did not act willfully because he was attempting to comply with federal and state regulations. See id.

## **DEFENDANT'S MOTION**

*Defendant's Argument*

The IRS argues that judgment is appropriate. Although Preimesberger relies on state and federal regulations relating to nursing homes, the Complaint does not actually allege that he provided a 60 day closure notice to residents or otherwise took steps to wind up the nursing homes. Instead, Preimesberger waited five quarters, 450 days, before completing the sale of the nursing homes and without paying withholding taxes. Further, courts, including the Ninth Circuit, hold that a taxpayer cannot prefer other creditors to the United States with respect to withholding taxes, and as long as there is a voluntary intentional act to prefer other creditors, there is willful conduct under § 6672. Three cases, *United States v. Hodges*, 684 F. App'x 722 (10th Cir. 2017), *Hochstein v. United States*, 900 F.2d 543 (2d Cir. 1990), and *Cook v. United States*, 52 Fed. Cl. 62

4

1  (2002), show that attempting to follow other regulations, particularly state regulations, does not
2  justify the failure to pay withholding taxes or defeat liability under § 6672. Additionally,
3  Preimesberger's argument that he could not pay withholding taxes because of lender restrictions
4  fails because there are no allegations that he attempted to prorate scarce resources between the
5  United States and the nursing home employees as required by *Sorrenson v. United States*, 521
6  F.2d 325 (9th Cir. 1975). Therefore, because Preimesberger's justifications for not paying the
7  withholding taxes have been rejected, judgment on the pleadings should be granted.

*Plaintiff's Opposition*

Preimesberger argues that judgment on the pleadings is not appropriate. First, Preimesberger contends that this motion is really a disguised motion for reconsideration. The IRS makes the same general arguments it made in its unsuccessful Rule 12(b)(6) motion, only it cites new cases that could have been cited in the original motion. Instead of following Local Rule 230(j), the IRS is improperly utilizing Rule 12(c). Second, the cases cited by the IRS are all non-binding and distinguishable. None of the cases involve federal regulations or federalized state regulations that affect how money is expended in connection with a nursing home. Further, unlike the situation in *Cook*, the Facilities were never in bankruptcy. Therefore, the Court's original analysis that found a plausible claim was correct and should remain in place.

*Legal Standard*

Employers are required to withhold federal income and social security taxes from the wages of their employees. Buffalow v. United States, 109 F.3d 570, 572 (9th Cir. 1997); Klotz v. United States, 602 F.2d 920, 923 (9th Cir. 1979). The withheld taxes are held by the employer in a trust fund for the United States and paid to the United States quarterly. See Buffalow, 109 F.3d at 572; see also Klotz, 602 F.2d at 923. The withheld taxes, known as "trust fund taxes," are credited to the employee, even if the employer never remits the trust fund taxes to the United States. See Buffalow, 109 F.3d at 572-73; Klotz, 602 F.2d at 923. One of the tools available to the United States to ensure the payment of trust fund taxes is § 6672. Purcell v. United States, 1 F.3d 932, 936 (9th Cir. 1993); Klotz, 602 F.2d at 923. Section 6672 provides in relevant part:

>  Any person required to collect, truthfully account for, and pay over any tax

> imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

26 U.S.C. § 6672(a). Section § 6672 is a penalty against a responsible person that creates "an obligation, separate and distinct from the underlying tax obligation." In re J.J. Re-Bar Corp., 644 F.3d 952, 957 (9th Cir. 2011). To impose liability against a party under § 6672, two requirements must be met: (1) the party must have been a "responsible person," that is, one required to collect, truthfully account for, and pay over the tax; and (2) the party must have "willfully" failed to pay the tax. Nakano v. United States, 742 F.3d 1208, 1211 (9th Cir. 2014); Rykoff v. United States, 40 F.3d 305, 307 (9th Cir. 1994). "Willfulness, within the meaning of § 6672, has been defined as a voluntary, conscious and intentional act to prefer other creditors over the United States." Nakano, 742 F.3d at 1211; Rykoff, 40 F.3d at 307; Klotz, 602 F.2d at 923. Neither an evil motive nor an intent to defraud the United States is necessary to demonstrate "willfulness." Rykoff, 40 F.3d at 307; Klotz, 602 F.2d at 923. While a reckless disregard of whether trust fund taxes being paid is sufficient to establish willfulness, mere negligence does not establish willfulness. Phillips v. United States, 73 F.3d 939, 942 (9th Cir. 1996); see also Klotz, 602 F.2d at 924 (mere negligence does not show willfulness). A lack of willfulness may be shown if the responsible person did not disregard his duties and undertook all reasonable efforts to see that the trust fund taxes would be paid. See Turpin v. United States, 970 F.2d 1344, 1350 (4th Cir. 1992); Feist v. United States, 607 F.2d 954, 961 (Ct. Cl. 1979). Also, a failure to use "encumbered funds" to pay trust fund taxes will not support a finding of willfulness. See Nakano, 742 F.3d at 1211-12; Purcell, 1 F.3d at 938. Funds are "encumbered" "only where the taxpayer is legally obligated to use the funds for a purpose other than satisfying the preexisting employment tax liability and if that legal obligation is superior to the interest of the IRS in the funds." Nakano, 742 F.3d at 1212. Generally, whether a party acted "willfully" for purposes of § 6672 is a question of fact. Rykoff, 40 F.3d at 307; Klotz, 602 F.2d at 923; Teel v. United States, 529 F.2d 903, 905 (9th Cir. 1976). A party challenging liability under § 6672 has the burden of demonstrating that his conduct was not willfully done. Rykoff, 40 F.3d at 307.

*Discussion*

1. Procedural Propriety of the IRS's Motion

The Court agrees that the IRS's Rule 12(c) motion is more or less a motion for reconsideration. Cf. Kimmel & Silverman, P.C. v. Porro, 969 F.Supp.2d 49, 50 (D. Mass. 2013) (holding that a Rule 12(c) motion was in actuality a motion for reconsideration and that the defendant had failed to show that reconsideration was warranted). Since the Court issued its ruling on the IRS's Rule 12(b)(6) motion, the IRS filed an answer, but Preimesberger did not file an amended complaint. Therefore, at least in terms of the allegations appearing in the Complaint, nothing has changed that would cause the Court to alter its previous analysis that the Complaint pled a plausible claim. The IRS is relying on additional cases that were not cited in its Rule 12(b)(6) motion to dismiss. The IRS's citation to new cases can be viewed as a variation of the argument that clear error was committed, which is a valid basis for reconsideration. Nevertheless, for two reasons the Court will not deny the IRS's motion as substantively the equivalent of a motion for reconsideration. First, the only procedural limitations on a Rule 12(c) motion is that the motion be made after the pleadings are closed but not so late as to delay trial. See Fed. R. Civ. P. 12(c). Neither of those limitations are violated by the IRS's motion. Second, if the IRS is correct and the new cases are sufficient to defeat Preimesberger's case, in other words, if the law is such that the Court erred in finding a plausible claim, then it is better to correct that error now before any further resources (private or judicial) are consumed. Cf. In re Apple IPhone Litig., 846 F.3d 313, 319 (9th Cir. 2017). Therefore, the Court declines to deny the IRS's motion on the procedural basis argued by Preimesberger.

2. Sufficiency of Preimesberger's Pleading

Each of the five Facilities at issue participated in the Medicare program. Skilled nursing facilities that participate in Medicare/Medicaid programs are regulated by state and federal governments. Greenbrier Nursing & Rehab. Ctr. v. United States HHS, 686 F.3d 521, 523 (8th Cir. 2012); United States v. Anderson, 605 F.3d 404, 407 (6th Cir. 2010); Boykin v. 1 Prospect Park ALF, LLC, 293 F.R.D. 308, 313 (E.D. N.Y. 2013); United States ex rel. Swan v. Covenant Care, Inc., 279 F.Supp.2d 1212, 1220 (E.D. Cal. 2002). Preimesberger's opposition identifies a

number of such regulations that allegedly impacted his actions. Specifically, federal law/regulations require skilled nursing facilities to: (1) provide "the highest practicable physical, mental and psychological well-being of each resident [per a written plan]," 42 U.S.C. § 1395i-3(b)(2); (2) provide services by a sufficient number of nurses and nursing personnel on a 24-hour basis so as to provide nursing care in accordance with each resident's care plan; see 42 C.F.R. § 483.30(a)(1);[1] see also 42 U.S.C. § 1395i-3(b)(4); (3) employ a qualified dietician and sufficient support staff to provide a "nourishing, palatable, well-balanced diet that meets the daily nutritional and special dietary needs of each resident," 42 C.F.R. § 483.35(a), (b); see also 42 U.S.C. § 1395i-3(b)(4); (4) provide or arrange for physician services 24-hours a day in case of an emergency, see 42 C.F.R. § 483.40(d); see also 42 U.S.C. § 1395i-3(b); (5) provide pharmaceutical services to meet the needs of each resident, see 42 C.F.R. 483.60; see also 42 U.S.C. § 1395i-3(b)(4); (6) establish and maintain an infection control program that ensures the provision of a safe, sanitary, and comfortable environment and to prevent the development and spread of disease, see 42 C.F.R. § 483.65; (7) be maintained to protect the health and safety of residents, personnel, and the public, see 42 C.F.R. § 483.70; and (8) "be administered in a manner that enables it to use its resources effectively and efficiently to attain or maintain the highest practicable physical, mental, and psychological well-being of each resident," 42 U.S.C. § 1395i-3(d)(1). Importantly, federal law also required that a skilled nursing facility "must operate and provide services in compliance with all applicable Federal, State, and local laws and regulations . . . and with accepted professional standards and principles which apply to professionals providing services in such a facility." 42 U.S.C. § 1395i-3(d)(4). Through the plain language of this regulation, state laws are incorporated into the federal regulatory scheme, thereby turning the relevant state laws into federal laws. See Sunshine Haven Nursing Operations, LLC v. United States HHS, 742 F.3d 1239, 1244 (10th Cir. 2014) (stating that federal law requires skilled nursing facilities to provide services in compliance with all applicable federal, state, and local laws and regulations and with accepted professional standards); Swan, 279 F.Supp.2d at 1220 (holding that he Social Security Act requires skilled

---

[1] All references to the C.F.R. refer to federal regulations that were in place at the relevant time period, April 2014 to June 2015.

nursing facilities to *inter alia* "conform to professional standards of care, and comply with all applicable federal and state regulation."); cf. Bragg v. West Va. Coal Ass'n, 248 F.3d 275, 294 (4th Cir. 2001) (holding that the Clean Water Act effectively incorporates state laws thereby making the relevant state law a federal law); Cook Inlet Region, Inc. v. Rude, 2011 U.S. Dist. LEXIS 159009, *4-*5 (D. Alaska Mar. 22, 2011) ("When federal law incorporates state law, such state law becomes federal . . . .").

California regulations have similar requirements in terms of staffing and services. See, e.g., 22 Cal. Code Reg. §§ 72305, 72321, 72329, 72335, 72531, 72353, 72385. As relevant to this case, Preimesberger highlights various requirements for a skilled nursing facility to close down. California law requires that a skilled nursing facility must submit a detailed assessment and relocation plan for each resident, including medical and psychological assessments. See Cal. Health & Safety Code § 1336.2. Relocation plans must be approved by the State Department of Public Health. See id. at § 1336.2(g). The Department of Health has 14 working days to accept or reject a relocation plan. See id. Until a relocation plan is finally approved, skilled nursing facilities are required to "maintain an appropriate level of staffing in order to ensure the well-being of all the residents as the continue to reside in the facility." Id. at § 1336.2(h). Once a relocation plan is approved by the Department of Health, skilled nursing facilities are required to give residents at least 60 days' notice of an impending closure. See id. at § 1336(a); Cal. Health & Safety Code § 1336.2(a)(4). Additionally, federal regulations require that skilled nursing facilities send notice to residents, the State Survey Agency, and the State LTC Ombudsman of an impending closure at least 60 days prior to the date of closure. See 42 C.F.R. § 483.75(r). The notice must include a copy of the state approved relocation plan. Id.

Both federal and state regulations provide penalties for facilities and administrators that fail to comply with regulations. A facility may suffer the termination of a provider agreement, may be denied Medicare/Medicaid payments, and may be subject to penalties ranging from $50 to $10,000 per day or $1,000 to $10,000 per occurrence. See 42 C.F.R. §§ 488.406, 488.438, 488.50. Further, an administrator who fails to comply with the process for closing a facility and transferring patients, or who fails to maintain the appropriate standard of care during the closing

9

1  process, may be fined not less than $500 for the first offense, $1,500 for the second offense, and

2  $3,000 for subsequent offenses and may be subject to any other penalties that may be prescribed

3  by law.  See id. at § 488.446.

4  In the Court's order on the IRS's Rule 12(b)(6) motion to dismiss, the Court concluded in

5  relevant part:

> [Viewing the allegations in the light most favorable to Preimesberger], the Court finds that the Complaint plausibly indicates that Preimesberger did not act "willfully" when he did not pay the trust fund taxes.  In essence, the Complaint alleges that Preimesberger could not simply cease operations when the cashflow situation reached its pinnacle.  Instead, federal and state regulations required Preimesberger to keep the Facilities operating at the existing standard of care.  To accomplish this, Preimesberger had to utilize a line of credit from CFI.  The line of credit permitted the Facilities to maintain the standard of care by paying employees, utilities (which powered necessary medical and therapeutic equipment), and landlords.  Although Preimesberger attempted to obtain funds from CFI that would cover the withholding taxes, CFI refused to release funds for that purpose.  Given the allegations regarding the Facilities' dire cashflow situation and the allegations that Preimesberger attempted to meet the various competing legal obligations (pay trust fund taxes and maintain the standard of care), the Court will infer that Preimesberger had no other viable funding options other than CFI's line of credit.  That is, the only way that Preimesberger could meet his mandatory regulatory obligations, which carried with them civil and criminal penalties for their violation, was to follow the restrictions of CFI.  Additionally, the allegations indicate that the money that was received from CFI was used to pay expenses/creditors that were necessary to maintaining the existing standard of care.  There are no allegations that the Facilities used CFI's funds to pay expenses that were not necessary to maintaining the standard of care.  Apart from the restrictions imposed by CFI, federal and state regulation appear to have *de facto* required that CFI's loan be spent to maintain the standard of care, which could arguably make the funds expended "encumbered."  Cf. Nakano, 742 F.3d at 1211.  Under these circumstances, Preimesberger's actions may be considered involuntary and thus, not willful.  The issue of willfulness is generally a question of fact.  See Rykoff, 40 F.3d at 307.  The factual allegations in the Complaint are not so clear that the Court can hold that Preimesberger's actions were "willful" as a matter of law.

21  Preimesberger v. United States, 2020 U.S. 139954, *13-*14 (E.D. Cal. Aug. 5, 2020).

22  After considering the allegations and the regulations cited by Preimesberger, the Court

23  does not find that its prior analysis was in error.  Viewing the allegations in the light most

24  favorable to Preimesberger as the non-moving party and making all reasonable inferences in his

25  favor, see Herrera, 953 F.3d at 1068; Hines, 914 F.3d at 1227, the Facilities experienced cash flow

26  problems because of the actions of the United States and California in not timely remitting

27  Medicare and Medi-Cal payments.  The United States also issued regulations that required the

28  Facilities to be operated at a level that met the applicable standard of care and that met the

physical, nutritional, and psychological needs of every resident. Failure to do so would subject the Facilities to various fines and penalties. No exceptions under federal law have been identified that would excuse a skilled nursing facility from not providing staffing, care, and services that met the applicable standard of care and the needs of its residents. Federal law also required the Facilities to pay trust fund taxes. To meet these two on-going federal obligations, the Complaint indicates that Preimesberger attempted to obtain funding from lenders and wait for the United States to remit Medicare payments. Unfortunately, despite Preimesberger's efforts, no loans were authorized that would include payment of the trust fund taxes. To maintain the standard of care as required by federal regulations, the Facilities accepted the loans and did not pay the trust fund taxes. The Complaint and the opposition show that, unlike a typical business, regulations prevented the Facilities from simply shutting down.[2] While taking loans and making payments to entities other than the United States that were necessary to maintain the standard of care, the Complaint indicates that Preimesberger was not idle and continued to search for options. Preimesberger was eventually able to find a buyer for the Facilities in the Summer of 2014. Completing the sale took longer than expected, but as part of the sales agreement, the buyer was obligated to pay all outstanding trust fund taxes.[3]

     In a nutshell, the Complaint indicates that Preimesberger attempted to meet two on-going duties that were required by federal law – pay trust fund taxes (a duty that applies to all businesses) and maintain the standard of care at the Facilities (a duty that applies uniquely to nursing homes and skilled nursing facilities) – the best way that he could, through loans that would not authorize payment of trust fund taxes (but would meet the federal obligation to maintain the standard of care) and a sales agreement that provided for the payment of outstanding trust fund

---

[2] The Court notes that it is unknown whether Preimesberger had the authority/ability to either close the Facilities or begin the regulatory process for closing the Facilities; Meridian had a 90% ownership interest in the Facilities.

[3] The Court notes that the IRS does not dispute the allegation that the sales agreement required Providence to pay all outstanding trust fund taxes. If that allegation is accurate, it is puzzling why the IRS would not attempt to collect the outstanding funds from a solvent entity that expressly agreed to pay those funds and instead choose to invoke § 6672 against a single individual who was attempting to meet the dual federal obligations of maintaining the standard of care and paying the trust fund taxes.

1 taxes and maintaining the standard of care, all the while waiting for untimely Medicare and Medi-
2 Cal payments, knowing that abruptly closing the facilities was not an option, and that failure to
3 meet the regulatory duty to maintain the standard of care would lead to fines and other corrective
4 action.  Because willfulness is generally a question of fact, see Rykoff, 40 F.3d at 307, and
5 because the allegations indicate that Preimesberger was not disregarding his federal obligations
6 but was taking reasonable steps to meet two on-going federal obligations, cf. Turpin, 970 F.2d at
7 1350; Feist, 607 F.2d at 961, the Court cannot hold that the allegations in the Complaint
8 demonstrate "willfulness" under § 6672 as a matter of law.

The IRS cites three out of circuit cases in support of its motion.  While these cases involve similar facts to this case, the Court nevertheless finds these cases to be distinguishable.

In *Hochstein v. United States*, 900 F.2d 543 (2d Cir. 1990), a manufacturing business obtained operating funds from a lender.  See Hochstein, 900 F.2d at 545.  Although the operating funds were not earmarked for any particular purpose, the loan agreement provided that the manufacturer was responsible for making all tax payments.  See id.  Eventually, the company requested money to cover both net wages and trust fund taxes.  See id. at 546.  The lender authorized only enough money to cover net pay.  See id.  The company shortly thereafter liquidated, with all proceeds going to the lender.  See id.  The IRS utilized § 6672 against the controller, Hochstein, to recover approximately $32, 000 in trust fund taxes.  See id.  The Second Circuit held that the lender's refusal to lend money for the purpose of paying the trust fund taxes still made Hochstein's conduct in paying only net wages a willful act.  See id. at 548.  Citing *Sorenson v. United States*, 521 F.2d 325, 328 (9th Cir. 1975), the Second Circuit held that Hochstein's duty was to prorate such funds as were available between the IRS (for payment of trust fund taxes) and employees (for payment of net wages).  Id.  Also, the Second Circuit held that Hochstein's reliance on a New York law that criminalized the failure to pay wages was misplaced.  See id. at 549.  The Second Circuit observed that good faith reliance on New York law was irrelevant because § 6672 does not consider a responsible party's good faith, New York law expressly authorized the withholding of federal taxes, and, to the extent that the New York law conflicted with § 6672, then § 6672 would preempt the New York law.  See id.

The Court appreciates that there are a number of relevant concepts in *Hochstein*. *Hochstein* can be said to stand for the proposition that the mere failure of a lender to authorize a loan to include the payment of trust fund taxes will not defeat "willfulness" under § 6672. Further, *Hochstein*'s holding that § 6672 preempts any conflicting state criminal laws may answer Preimesberger's concerns over California laws that carry with them a criminal penalty. However, unlike this case, *Hochstein* does not involve a separate and specific on-going federal regulatory duty to maintain the standard of care for nursing home residents. Relatedly, *Hochstein* (and *Sorenson*) does not explain whether a nursing home must pro-rate funds between the IRS and the expenses necessary to meet the standard of care when federal regulations require the standard to be maintained.[4] Further, *Hochstein* did not discuss any additional efforts that the controller had taken to meet the trust fund payment obligations. Finally, unlike the manufacturing business in *Hochstein*, the Facilities could not simply close down or immediately liquidate. Therefore, *Hochstein* does not require a finding that Preimesberger engaged in "willful" conduct.

In *Cook v. United States*, 52 Fed. Cl. 62 (2002), Mr. Cook was an officer of a bankrupt engineering firm who had paid other creditors before the United States, but did not prorate any of the available funds between the United States (for trust fund taxes) and other creditors (such as employees), and apparently concealed the outstanding trust fund taxes from the bankruptcy court. See Cook, 52 Fed. Cl. at 71-74. Mr. Cook argued in part that his conduct was not willful because the company was under bankruptcy orders that "effectively" compelled the payment of funds for the purposes of curing environmental problems. See id. at 71. The Court of Federal Claims rejected this argument. The *Cook* Court found that the bankruptcy court made no orders regarding the payment of trust fund taxes, the bankruptcy court was not informed of any outstanding trust fund tax obligations, Mr. Cook took no actions to get clarification of the bankruptcy court's orders, and, while some funds were encumbered by the bankruptcy orders, the bankruptcy court did not encumber all funds because it left Mr. Cook with discretion to pay the company's

---

[4] There is no indication in the Complaint that the Facilities paid material expenses that were not necessary to maintaining the standard of care and meeting the physical, psychological, and nutritional needs of its residents. Therefore, the Court will view the Complaint as reasonably inferring that if some form of proration had occurred, then the standard of care and the needs of the residents would not have been adequately met.

13

1 operating costs. Id. at 71-74. Therefore, the Court of Federal Claims held that Mr. Cook was "willful" under § 6672. See id.

Like *Hochstein*, *Cook* does not involve a skilled nursing facility/nursing home or specific on-going federal regulations that required the maintaining of the standard of care and meeting the physical, psychological, and nutritional needs of the elderly residents. Moreover, *Cook* did not involve any conflict between government imposed duties. The Court of Federal Claims rejected the argument that the bankruptcy court either expressly or impliedly had encumbered all of the company's funds, had limited how all funds were to be spent, or had ordered that the trust fund taxes could not be paid. Here, because this is a Rule 12(c) motion, the Court accepts that, in order to meet the applicable standard of care and the physical, psychological, and nutritional needs of the Facilities' residents, all of the available funds had to be spent to meet these federally mandated care obligations. Further, unlike Mr. Cook, there is no indication that Preimesberger engaged in any kind of deceptive conduct with respect to outstanding trust fund taxes or that he recklessly hid or ignored the trust fund taxes. Finally, *Cook* did not discuss any efforts that had been made to meet the trust fund tax obligations.[5] On the other hand, Preimesberger actively sought funding and an eventual buyer for the Facilities in order for the Facilities to maintain the standard of care and pay outstanding trust fund taxes.

Finally, in *United States v. Hodges*, 684 F. App'x 722 (10th Cir. 2017), Mr. Hodges had been appointed as the temporary manager of a nursing home by the Oklahoma Department of Health. Hodges failed to pay the trust fund taxes of the nursing home's employees. See Hodges, 684 F. App'x at 724. Hodges contended that his conduct was not "willful" under § 6672 because he needed to use the payroll taxes to "rescue residents from the horrific conditions," and that if he had closed the nursing home then hundreds of employees would have been fired. See id. at 729.

---

[5] *Cook* held that a responsible party cannot view his withholding responsibilities through a combination of blinders and rose-colored glasses. See Cook, 52 Fed. Cl. at 72. The IRS argues that Preimesberger is wearing blinders and ignoring his obligations under § 6672. While the Court agrees with the sentiment in *Cook*, the Court disagrees that this is what Preimesberger was doing. In the context of Rule 12(c), the allegations indicate that Preimesberger was aware of two on-going federal obligations, one of which required the Facilities to meet the standard of care at all times. Because both obligations could not be met, Preimesberger did what he could to meet both mandated obligations. His efforts led to always fulfilling the standard of care obligation and attempting to meet the tax obligation through loans and a contractual agreement with the purchaser of the Facilities. Based on the allegations in the Complaint, this is not conduct done with rose-colored glasses or blinders.

14

The Tenth Circuit rejected Hodges's arguments and found that a business's financial straits are almost always at issue in § 6672 cases, and that under the Circuit's "reasonable cause" exception to willfulness, Hodges had failed to make any effort to protect the trust fund taxes. See id.

Admittedly, *Hodges* is much closer to the facts of this case than either *Cook* or *Hochstein* in that *Hodges* actually involves a nursing home and a similar argument to that of Preimesberger: Mr. Hodges argued that he was trying to care for the residents. However, the Court does not find that *Hodges* is dispositive. First, Preimesberger is not contending either that his conduct meets the Tenth Circuit's reasonable cause exception or that this exception has any application to this case. Second, and more importantly, the argument that was made in *Hodges* is not the same argument being made in this case. *Hodges* did not cite to or address the federal laws and regulations that required the applicable standard of care to be met at all times. *Hodges* does not explain what to do when faced with competing federal obligations or explain why § 6672 requires a responsible party to violate other duties imposed by federal law and regulation, particularly when the physical and psychological well-being of vulnerable individuals is at stake.[6] That is, *Hodges* does not expressly address how a responsible person is to navigate competing federal obligations when both obligations cannot be met, and the business cannot simply be shuttered. Third, *Hodges* does not discuss what efforts were undertaken to address the obligation to pay trust fund taxes. In contrast, Preimesberger waited on Medicare and Medi-Cal to remit late payments owed to the Facilities, attempted to get loans, sought out a buyer for the Facilities, and negotiated the sale of the Facilities to a buyer who agreed to pay the outstanding trust fund taxes, all while meeting the federal obligation to maintain the standard of care. Therefore, the Court declines to hold that the unpublished *Hodges* opinion dictates a finding that Preimesberger acted "willfully" under § 6672.

In sum, the allegations do not demonstrate "willfulness" as a matter of law. Therefore, judgment on the pleadings in favor of the IRS is not appropriate.

---

[6] The Court is not suggesting that Preimesberger and the Facilities could indefinitely fail to pay trust fund taxes, nor does the Court believe that Preimesberger is making this suggestion. Preimesberger recognized the obligation to pay the trust fund taxes and attempted to meet that obligation through loans and the sale of the Facilities. The Court merely holds that the allegations are sufficient under Rule 12(c) to plausibly allege that his conduct was not "willful." While the allegations could be more detailed to answer some of the IRS's criticisms of Preimesberger's conduct, that level of pleading is unnecessary in the context of Rule 12(c). Of course, the Court's holding does not address all other possible issues concerning "willfulness" or defeat a future Rule 56 motion.

## **ORDER**

Accordingly, IT IS HEREBY ORDERED that Defendant's Rule 12(c) motion for judgment on the pleadings (Doc. No. 22) is DENIED.

IT IS SO ORDERED.

Dated:  May 25, 2021

_____
SENIOR DISTRICT JUDGE